# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD JACOBY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 06-2339 |
| v. | : | |
| | : | |
| ARKEMA INC. | : | |
| d/b/a ATOGLAS | : | |
| d/b/a ATOFINA CHEMICALS, | : | |
| Defendants. | | |

## Memorandum and Order

YOHN, J.                                                    October _____, 2007

Plaintiff Leonard Jacoby brings this lawsuit against his former employer, defendant

Arkema Inc. ("Arkema"),[1] alleging claims of employment discrimination and retaliation in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Family Medical

Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 *et seq.*[2]  Jacoby, a sixty-two year old male[3] who has

---

[1]Arkema, misspelled in the caption of the complaint as "Armeka," does business as Atoglas and Atofina Chemicals.

[2]I will not address Jacoby's PHRA and ADA discrimination claims separately because courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ.* 94 F.3d 102, 105 (3d Cir. 1996) (citations omitted).  I will also not discuss Jacoby's PHRA and ADEA claims separately because in Pennsylvania the same legal standards and burdens of proof govern PHRA and ADEA claims.  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n.1 (3d Cir. 2005).

[3]Jacoby was sixty-two years of age as of the date that the complaint was filed on June 2, 2006.

suffered from severe knee ailments, claims that Arkema discriminated against him because of his

disability and/or perceived disability and age, and terminated him because of his opposition to

Arkema's discrimination and because of his exercise of his rights under the FMLA.  Presently

before the court is Arkema's motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  For the reasons set forth below, I will grant Arkema's motion as to each of

Jacoby's claims.

I.    **Background**[4]

    A.    **Jacoby's Responsibilities as a Pennsylvania Monomer Supervisor at Arkema's Bristol Plant**

In September 1987, Arkema's predecessor, Rohm and Haas, hired Jacoby as a janitor at

its Bristol, Pennsylvania plant ("Bristol Plant").  (Pl.'s Dep.19-20, 22.)  Jacoby was promoted to

the position of Level Four Operator in 1988, and received another promotion the following year

to the position of Level Six Operator.  (*Id.* at 19-20.)  In 2001, Jacoby became a PM Supervisor.[5]

(*Id.* at 36.)  At its Bristol Plant (also referred to as its PM Plant), Arkema produces plastic pellets

for making Plexiglass.  (Pl.'s Dep. 19; Delisi[6] Dep. 9-10.)  The chemicals used at the plant are

hazardous and must be handled with caution and closely monitored.  (Pl.'s Dep. 60.)  As a result,

Arkema has instituted a number of safety procedures and contingency plans that it trains its

employees to implement in the event of an emergency.  (*Id.* at 61-63.)  As a PM Supervisor,

---

[4]The following account contains admitted facts and plaintiffs' factual allegations because
when deciding a motion for summary judgment courts must view all facts and inferences in the
light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 255 (1986).

[5]"PM" stands for Pennsylvania Monomer, a chemical.

[6]Andrew Delisi is a PM Operator at Arkema's Bristol Plant.

Jacoby was responsible for maintaining the safe operation of the plant.[7]   (*Id.* at 60.)

As a PM Supervisor, Jacoby frequently worked the second or third shift when he was often the only manager on duty and responsible for the entire plant.  (Pl.'s Dep. 188; Dopson[8] Dep. 111-13.)  Jacoby's job required him to order materials for the plant's start-up and shut-downs, perform troubleshooting as needed, maintain the overall safety of highly volatile chemicals, act as a first responder in emergency situations, collect data for and prepare morning and accident reports, supervise transitions from one product to another, and supervise the connections of rail cars carrying raw materials.  (Pl.'s Dep. 60-82.)

As the Bristol Plant was in operation 24 hours a day, seven days a week, the troubleshooting aspect of Jacoby's position was particular important.  (Pl.'s Dep. 46; Dopson Dep. 111-12.)  In order to ensure the plant's safe, efficient, and continuous operation, PM Supervisors handled process upsets and made minor repairs as needed.  (Dopson Dep. 31, 112-13; Bretz[9] Aff. ¶¶ 12-13.)  Troubleshooting problems with the process and equipment might require Jacoby to kneel down or crawl under rail cars to examine nozzles, boots, and hose connections.  (Pl.'s Dep. 65-66, 70-71.)  Jacoby "very rarely" kneeled and crawled under the cars to make the necessary examinations and repairs because a Level Four or Level Five Operator

---

[7]To give a sense of the overall size Jacoby was responsible for controlling as a PM Supervisor, Jacoby testified that the physical area approximated four football fields.  (Pl.'s Dep. 73.)

[8]Michael Dopson, the Resins Production Manager, was Jacoby's direct supervisor at all relevant times.  He also held the PM Supervisor position previously for eight years.

[9]Todd E. Bretz is the Health and Safety Manager of Arkema's Bristol Plant.  He manages Arkema's return-to-work program and performs return-to-work evaluations of Arkema employees.  (Bretz Aff. ¶¶ 1-2.)

usually did so "90 percent of the time." (Pl.'s Dep. 69-70.) Thus, while Jacoby supervised the processes at the plant, the physical roles of the job were usually the responsibilities of subordinate employees. (*Id.* at 69-70.) However, in his deposition testimony, Jacoby agreed that it was "expected" that he would be "fully capable" of being able to bend and crawl under a rail car. (Pl.'s Dep. 70-71.)

In addition, as a PM Supervisor, Jacoby had to verify the safety of equipment before outside mechanics could work on it. (Dopson Dep. 55-57.) Even if a subordinate employee could assist with turning off the necessary valves, the PM Supervisor personally had to verify and tag the equipment as safe. (*Id.*) While this task did not often require a supervisor to kneel or crawl,[10] occasionally, a supervisor would have to crawl, climb or maneuver around to get to equipment in an area difficult to access, particularly to confirm that any hazardous energy flow had been stopped. (*Id.*)

Another major responsibility of the PM Supervisor was to manage movement of rail cars delivering materials to the plant for processing. (Dopson Dep. 32, 96-98, 106.) PM Supervisors were almost exclusively responsible for throwing the rail switches to direct the rail cars, and they worked together with the operators to hook up the air lines for the air brakes between the cars and the locomotive. (*Id.* at 106-07.) In that role, Jacoby had to pull rail switches himself, a task that did not require much force. (Pl.'s Dep. 65.) Jacoby also had to pull himself up on top of the rail car ladder to set the brake, a task that required lifting but not kneeling or crawling. (Dopson Dep. 96-97.)

---

[10]Dopson testified that in eight years as a PM Supervisor, he kneeled and crawled to perform this task less than five or ten times. (Dopson Dep. 55-56.)

As a first responder to emergencies, Jacoby was responsible for calling the fire department, turning on the alarm, clearing the building and accounting for every employee. (Pl.'s Dep. 61-62.) To assist an employee in trouble, a PM Supervisor would need to react quickly to provide medical assistance or to help an employee to safety. (Dopson Dep. 99-100, 114-15.)[11] For instance, if an employee were unconscious, the PM Supervisor might need to drag or carry the employee to a secure area. (Dopson Dep. 114-15.)

Additionally, Jacoby was responsible for emergency spill response and remediation, which required that he go to the site of the spill and supervise the clean up. (Pl.'s Dep. 79-80.) If the spill was a hazardous chemical, Level Four and Level Six Operators were responsible for lifting fifty-pound sand bags around the spill to dike it off as quickly as possible. (*Id.* at 81.) Jacoby also testified that he would "help" to lift the fifty-pound sand bags and place them to dike the spills. (Pl.'s Dep. 82.)

### B.     Jacoby's Knee Replacement Surgeries and Various Leaves of Absence in 2001, 2003, 2004, 2005, and 2006

In 2001, Jacoby had total knee replacement surgery on his right knee due to joint deterioration. (Pl.'s Dep. 24, 26.) He requested and was granted a six-month leave, and he returned to work without any physical restrictions imposed by his doctor. (*Id.* at 24-26.)

On May 12, 2003, Jacoby's left knee was surgically replaced due to joint deterioration. (Pl.'s Dep. 95.) Jacoby requested and was granted a four-month leave. At first, Dr. Schoifet, Jacoby's orthopedic surgeon, estimated that Jacoby would be ready to return to work on

---

[11]Dopson testified that he only encountered medical emergencies two times in his eight years as a PM Supervisor and did not need to kneel or crawl to respond to these emergencies. (Dopson Dep. 61-62.) One emergency involved a possible heart attack and the other entailed a possible stroke. (*Id.*)

5

September 12, 2003.  (*Id.* at 95-96, 115.)  But, in September 2003, Jacoby began to complain to Dr. Schoifet about pain in his left knee.  (*Id.* at 165.)  Dr. Schoifet believed Jacoby had developed sciatica and arthrofibrosis.  (*Id.* at 115; Pl.'s Dep. Ex. 9.)  Arkema allowed Jacoby to extend his leave by an additional four months, during which he received additional medical treatment. Jacoby was cleared by Dr. Schoifet to return to work on January 7, 2004 with the restrictions that he could not kneel or crawl.  (*Id.* at 91, 112.)

Prior to his return to work, Arkema required Jacoby to complete a "return-to-work" medical evaluation at Healthworks, a medical program operated by Temple University.  (Pl.'s Dep. 113-14, 116-17; McGee[12] Dep. 22-23, 31.)  This evaluation was mandatory for any Arkema employee who was out on medical leave for more than three days.  (Pl.'s Dep. 117.)  On January 6, 2004, Jacoby was examined at Healthworks in Lower Bucks County, Pennsylvania. Healthworks confirmed that Jacoby could return to work the next day with the kneeling and crawling restrictions.  (Pl.'s Dep. Ex. 8;[13] Pl's Dep. 91, 112-13.)

In January 2004, Arkema provided Jacoby with a temporary light duty assignment, which required that he primarily review documents, to permit him to return to work with the physical restrictions imposed by his doctors.  (Pl.'s Dep. 118; Dopson Dep. 84-87.)  Soon after Jacoby returned to work, other employees observed him limping.  (Pl.'s Dep. 122-23; Dopson Dep. 79-80.)  Dopson saw Jacoby almost collapse to the floor as Jacoby was walking within the plant. (Dopson Dep. 80-81.)

---

[12]Gloria McGee is an Administrative Assistant at Arkema who handles some of the responsibilities of processing paperwork for employees' leaves of absences.

[13]The Healthworks Medical Report Form is mistakenly dated January 6, 2003.  (*See* Pl.'s Dep. Ex. 8.)

On February 26, 2004, Wendy Griffith, the Human Resources Manager, met with Jacoby and provided him with a copy of a letter being sent to Dr. Schoifet, which stated that when Jacoby returned to work one month prior, he had been placed on a light duty work assignment. (Pl.'s Dep. Ex. 10.)  The letter further stated that the light duty assignment was completed and Jacoby should return to his PM Supervisor position, which required that he: (1) be able to climb four flights of stairs, (2) respond quickly and handle emergencies, (3) walk around on wet surfaces, (4) maneuver and climb around equipment, and (5) direct rail cars on railroad tracks. (*Id.*)  Griffith and Jacoby discussed the letter, and Jacoby admitted to Griffith that he was having problems getting around the plant and that he was limping.  (*Id.* at 31, 126.)[14]  Griffith informed him that he would have to be re-evaluated by his doctor or Healthworks, and Jacoby agreed.  (*Id.* at 125-26.)

During the February 26, 2004 meeting, Griffith was polite, professional, and respectful toward Jacoby.  (Pl.'s Dep. 135).  Jacoby testified that he did not think Griffith was discriminating against him when she called him down to her office, told him she had reports that he was limping around the plant, and asked him to go see his doctor.  (*Id.* at 141.)  At this time, neither Griffith nor any other Arkema employee told Jacoby that he was being terminated or that he could not go back to work (Pl.'s Dep. 126, 133), or made any statements regarding his age or stated that he was too old to perform his job (*id.* at 135-36).

On March 2, 2004, Dr. Schoifet examined Jacoby and determined that Jacoby could return to work, but that he could not kneel or crawl.  (Pl.'s Dep. 128; Pl.'s Dep. Ex. 11.)  Two

---

[14]At around the same time as his February 26, 2004 meeting with Griffith, Jacoby also admitted to Dopson, his supervisor, that he felt he had returned to work too early from his knee surgery.  (Dopson Dep. 82.)

days later, Jacoby visited another doctor, Dr. Dorfner, because he was upset that Arkema

requested that he be re-examined despite the fact that he had agreed that he was still having

difficulty with his left knee and that his mobility was impaired.  (Pl.'s Dep. 126, 133-138.)  Dr.

Dorfner recommended that Jacoby should not return to work until September 8, 2004 because of

"stress."  (*Id.* at 133.)[15]  Jacoby remained out of work from the time of his visit with Dr. Schoifet

in early March 2004.  (Pl.'s Dep. 157.)

On April 23, 2004, Jacoby was evaluated by a Healthworks' doctor, Dr. Bui, to determine

if he was physically fit to return to work.  (*Id.* at 161.)  Jacoby, whose left knee had become

progressively worse, told Dr. Bui that he was unable to perform the "necessary requirements" of

his job that were noted in Griffith's letter.  (Pl.'s Dep. 160-61.)  Specifically, Jacoby told Dr. Bui

he could not climb four flights of stairs, respond quickly to emergencies, walk around and

maneuver around equipment, or walk on wet or uneven surfaces.  (*Id.*)  Jacoby also related to Dr.

Bui that he felt Dr. Schoifet was sending him back to work before he was ready.  (*Id.* at 159-60.)

On May 7, 2004, Jacoby returned to Dr. Schoifet, who determined that his left knee

replacement had become infected.  (Pl.'s Dep. 167-78.)  Jacoby requested and was granted a six-

month leave to undergo two additional surgeries – one to remove the left knee replacement and

have it temporarily replaced with a spacer packed with antibiotics to clear the infection and a

second to replace the knee replacement.  (*Id.* at 170-71.)  Jacoby provided Arkema with an

Accident and Sickness Statement completed by Dr. Schoifet, which estimated Jacoby would not

be able to return to work until November 1, 2004.  (*Id.*; Pl.'s Dep. Ex. 15.)  However, Jacoby's

---

[15]According to documentation from Arkema's Workers' Compensation insurance carrier,
Jacoby's workers' compensation claim for "anxiety from job stress" was denied.  (Def.'s Ex. G.)

leave was extended beyond his original November 2004 return time for an additional five

months.  Dr. Schoifet released Jacoby to return to work on April 15, 2005 with kneeling and

crawling prohibitions.  (Pl.'s Dep. 192.)

Again, Arkema policy required Jacoby to be examined by Healthworks before his return

to work.  (Pl.'s Dep. 176, 185; Bretz Aff. ¶ 10.)  On April 11, 2005, Dr. Michael Goldstein, a

Healthworks' doctor, examined Jacoby and confirmed the kneeling and crawling limitations

noted by Dr. Schoifet.  (Pl.'s Dep. 190-91; Pl's Dep. Ex. 17.)  Dr. Goldstein also determined

Jacoby could not lift over fifty pounds.  (*Id*.)  Jacoby gave his return-to-work paperwork,

including forms indicating the physical restrictions, to Gloria McGee, an Administrative

Assistant.[16]  (*Id*. at 195.)  After reviewing this paperwork, Peter Yacoe, the Bristol Plant

Manager, together with Bretz and Dopson, deemed Jacoby unable to safely perform the essential

functions of the PM Supervisor position with the prohibitions on kneeling, crawling, and lifting

more than fifty pounds.[17]  (Pl.'s Dep. 197; Dopson Dep. 9, 14, 88-92; Bretz Aff. ¶¶ 11-19.)  Bretz

---

[16]While Jacoby was out on leave, Griffith left the company and McGee took over some of the responsibilities of processing paperwork for employees going on and returning from leaves of absence.  (Pl.'s Dep. 175; McGee Dep.12.)

[17]In his affidavit supplied by Arkema, Bretz describes the return-to-work evaluation in general and how the process was performed for Jacoby.  On April 11, 2005, Bretz compared the requirements necessary to perform the PM Supervisor job as set forth in the job description and the Job Profile and Work Environment ("JPWE") form to the medical documentation received from Healthworks.  (Bretz Aff. ¶¶ 3-4.)  According to Bretz, the job description (attached by Arkema as Pl.'s Dep. Ex. 2) listed as responsibilities of the PM Supervisor the ability to respond to emergency situations and conduct spill response/remediation.  (Pl.'s Dep. Ex. 2 ¶ 13.)  The JPWE form (attached by Arkema as Ex. A to its sur-reply) listed as the position requirements the capability to lift more than fifty pounds, crawl and to respond to emergency situations.  (*See* Def.'s Sur-Reply Ex. A.)  For instance, Bretz estimated that, based on his specific testing of a rail switch used to move rail cars, it could take at least sixty pounds of force, or seventy pounds if the switch were stuck, to move the switch.  (Bretz Aff. ¶ 14 n.1.)  Bretz preliminarily determined that because of Jacoby's inability to kneel, crawl, or lift more than fifty pounds, Jacoby was unable to

and Yacoe also considered whether there were any reasonable accommodations that could allow Jacoby to perform his job despite the kneeling, crawling, and lifting restrictions, but concluded that there were none.  (Pl.'s Dep. Ex. 18; Bretz Aff. ¶ 21.)[18]

On April 15, 2005, Jacoby attempted to resume his PM Supervisor responsibilities (Compl. ¶ 36), but Dopson told him he could not return to work.  (Pl.'s Dep. 197.)  Specifically, Dopson informed Jacoby he could not return to his position with the present stipulations and restrictions.  (*Id.* at 91-92, 197.)

Jacoby continued to be out on disability for the ten months following his April 15, 2005 meeting with Dopson until the day he retired in February 2006.  (Pl.'s Dep. 36.)  In order to receive long-term disability payments, Jacoby was required to establish that he could not perform the requirements of his position, as they were defined by Arkema.  (Pl.'s Dep. 101-03; Pl.'s Dep. Ex. 18.)  However, Jacoby states that his "actual job duties" did not involve any crawling or kneeling.  (*Id.* at 198.)  During these ten months, Jacoby did not provide Arkema with any further documentation or information about his medical condition.  (*Id.* at 202.)  Although Jacoby now believes as of his deposition on January 23, 2007 that his knees are "95 percent" healed, prior to his retirement, he never informed Arkema that he no longer had physical restrictions on kneeling, crawling, and lifting.  (*Id.* at 92, 167.)

_____

perform the requirements of the job.  (*Id.* ¶ 15.)  Bretz met with Dopson, who, as a former PM Supervisor, was aware of the job's physical requirements and concurred with Bretz's preliminary finding.  (*Id.* ¶¶ 16-18.)  Bretz and Dopson recommended that Jacoby not be eligible to return to work, and Yacoe approved the recommendation.  (*Id.* ¶¶ 19, 22.)

[18]According to Bretz, Jacoby had not requested a reasonable accommodation.  (Bretz Aff. ¶ 20.)  Jacoby testified he never felt the need to request an accommodation because he believed that kneeling and crawling were not essential to his job.  (Pl.'s Dep. 198.)

### C.      Jacoby's Retirement from Arkema in February 2006

During Jacoby's medical leave in 2004, Arkema did not hire anyone from outside the company to replace Jacoby.   (Dopson Dep. 23-24.)  However, Brian Kirschner, another PM Supervisor who was 39 or 40 years old, filled in for Jacoby.  (*Id*.)  According to Jacoby, Kirschner effectively replaced him, and his departure from Arkema was not a "true retirement." (Pl.'s Resp. to Def.'s Statement of Allegedly Undisputed Facts Nos. 90, 91, 92, 98.)

The only person at the Bristol Plant who ever discussed retirement with Jacoby was McGee, who was not a management-level employee and had no supervisory control over Jacoby. (Pl.'s Dep. 45-47, 137; McGee Dep. 79.)  She first had a conversation with Jacoby regarding retirement on or around April 11, 2005.  (McGee Dep. 45.)  She raised the issue of retirement on her own accord[19] because she was present during the conversation in which Bretz and Yacoe discussed Jacoby's inability to perform the essential functions of his job with the physical restrictions imposed by his doctor.  (Pl.'s Dep. 40; McGee Dep. 35, 44.)  McGee testified that she knew retirement was not mandatory and she did not present it to Jacoby as a mandate, but she realized Jacoby had many years of service with Arkema, so she thought retirement might be an option he could consider.  (*Id*. at 38, 42, 43, 57.)  During this initial conversation, McGee informed Jacoby that she would have retirement papers drafted and sent to him for his consideration.  (*Id*. at 30.)  Jacoby expressed to McGee that he was not interested in retirement at that time.  (Pl.'s Dep. 39.)  According to Jacoby, he told her that she could have the papers sent to him, but that he was not retiring.  (*Id.* at 40.)

---

[19]McGee testified that no one ever suggested to her that she discuss retirement with Jacoby, and she did not hear anyone say that Jacoby should retire.  (McGee Dep. 35.)

Without any input of a management-level employee, McGee contacted Arkema's central office and had retirement papers drawn up for Jacoby and sent for him to review.  (McGee Dep. 42, 43, 59.)  Jacoby testified that he received these papers within three days of his initial conversation about retirement with McGee.  (Pl.'s Dep. 143.)  After receiving the papers, Jacoby called the business office to inform Arkema that he was not going to retire, and the Human Resources representative with whom he spoke confirmed that he did not have to retire.  (Pl.'s Dep. 203.)  Jacoby also contacted McGee to inform her he had not requested the retirement papers.  (*Id.* at 45.)[20]  The only other time Jacoby communicated with any Arkema employee about retirement was when he formally notified Arkema in December 2005 that he was retiring. (*Id.* at 47.)[21]

Prior to his February 2006 retirement, no Arkema employee ever told Jacoby that he was too old to do his job.  Jacoby testified that he never heard anyone make any derogatory comments about his age or medical condition.  (Pl.'s Dep. 135-36.)  Further, Jacoby testified that he did not think that anyone from Arkema suggested that his being out of work recuperating from his knee surgeries somehow created a problem for Arkema.  (*Id.* at 105-06.)  He also testified that no one from Arkema ever interfered with his ability to receive or continue his disability benefits as needed.  (*Id.* at 102-03.)  Jacoby agrees that the only statement Arkema made to him regarding his medical condition was that he could not return to his particular position in April 2005 while he had the restrictions on his kneeling, crawling, and lifting.  (*Id.* at 137.)  However, Jacoby

---

[20]Jacoby does not otherwise recall the details of his discussion with McGee after he received the retirement papers.  (Pl.'s Dep. 47.)

[21]Jacoby testified that he formally notified Arkema that he was retiring in December of 2005 because his disability benefits "were running out."  (Pl.'s Dep. 47.)

maintains that he was willing to work at that time, and would have continued to work if he had been permitted to by Arkema.  (*Id.* at 214-15.)  After he retired, Jacoby did not re-apply for his position or for any other position with Arkema.  (*Id.* at 92.)

Jacoby filed his complaint against Arkema on June 2, 2006.  On August 4, 2006, Arkema filed its answer and affirmative defenses, and on May 11, 2007, moved for summary judgment on all counts.  Jacoby responded to Arkema's motion to which Arkema filed a memorandum in further support of its motion.

**II.      Standard of Review**

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.,* 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).  The non-movant must present concrete evidence supporting each essential element of its claim.  *Celotex*, 477 U.S. at 322-23.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed." *Anderson*, 477 U.S. at 255.  Furthermore, "[a]ll justifiable inferences

are to be drawn in [the non-movant's] favor." *Id.*  "Summary judgment may not be granted . . . if

there is a disagreement over what inferences can be reasonably drawn from the facts even if the

facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted).  However, "an inference

based upon a speculation or conjecture does not create a material factual dispute sufficient to

defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d

Cir. 1990).  The non-movant must show more than "[t]he mere existence of a scintilla of

evidence" for elements on which he bears the burden of production.  *Anderson*, 477 U.S. at 252.

Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations

omitted).  Finally, summary judgment is improper when a case turns on credibility

determinations, *see Anderson*, 477 U.S. at 255, and, as the Third Circuit has noted, on state of

mind, *see Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.

1993); *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985).

**III.    Discussion**

    **A.    Disability Discrimination Claims (Counts I and VI)**

    Jacoby alleges that during the course of his employment with Arkema, he was singled out

and subjected to a pattern of discrimination and harassment due to his alleged disability or

perceived disability.  (Compl. ¶ 37.)  Arkema's discriminatory conducted included refusing to

permit Jacoby to return from his various leaves of absence, eliminating Jacoby's shift differential

pay, requiring Jacoby to take additional tests even after two doctors had cleared him to return to

work, and terminating him.  (*Id.*)  However, because Jacoby fails to present sufficient evidence

for a reasonable jury to find that he is disabled within the meaning of the ADA, I will grant

Arkema's motion for summary judgment on this issue.

"The ADA provides that 'no covered entity shall discriminate against a qualified

individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment.'" *Gaul v.*

*Lucent Techs.*, 134 F.3d 576, 579 (3d Cir. 1998) (citing 42 U.S.C. § 12112(a)).  In order to state a

*prima facie* case of discrimination under the ADA, a plaintiff must establish that "(1) he is a

disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the

essential functions of the job, with or without reasonable accommodations by the employer; and

(3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Id.*

at 580; *see also Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 142 (3d Cir. 1998) (en banc) (citing

*Gaul*, 134 F.3d at 580).  At the first step of the *prima facie* case, a plaintiff must present evidence

that he is "disabled" under the ADA:

> The term "disability" means, with respect to an individual --
> (A) a physical or mental impairment that substantially limits one or more of
> the major life activities of such an individual;
> (B) a record of such impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

   In its motion, Arkema contends that Jacoby fails to meet his burden at this first step.  For

the reasons provided below, I agree.

### 1.     An Impairment or Record of Such Impairment

In his complaint, Jacoby alleges that he is disabled within the meaning of the ADA

because "he has, or had at all times relevant hereto, a physical impairment that substantially

limited/limits one or major life activities, or because he had a record of such impairment."

(Compl. ¶ 40.)   To satisfy the first statutory definition of "disability," a plaintiff must "show that

[he] has an impairment; identify the life activity that [he] claims is limited by the impairment;

and prove that the limitation is substantial." *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 382

(3d Cir. 2004) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).   Here, it is undisputed that

Jacoby suffers from a severe knee ailment which has required the replacement of both knees and

therefore constitutes a physical impairment under the ADA.  *See* 29 C.F.R. § 1630.2(h)

("Physical or mental impairment means . . . [a]ny physiological disorder or condition . . .

affecting one or more of the following body systems: . . . musculoskeletal . . .").   While Jacoby's

complaint does not specifically identify which major life activity was restricted by his

impairment, he asserts in his opposition that his knee replacements substantially limited his

abilities to kneel, crawl and lift more than fifty pounds.   In its motion for summary judgment,

Arkema argues that Jacoby's knee impairment does not "substantially limit one or more of the

major life activities," thus, it is not a disability within the meaning of the ADA.  *See* §

12102(2)(A).

Under § 12012(2)(A), "'major life activities' . . . refers to those activities that are of

central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197

(2002).  Major life activities are "functions such as caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i), as

well as "sitting, standing, lifting, [and] reaching," 29 C.F.R. pt. 1630, app. § 1630.2(i).  *See also*

*Bragdon*, 524 U.S. at 638-39; *Marinelli v. City of Erie*, 216 F.3d 354, 361 (3d Cir. 2000).

16

"Substantially limits" means being "unable to perform a major life activity that the average person in the general population can perform, or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1)(i)-(ii).

The Supreme Court has made clear that the terms "major life activities" and "substantial limitation" must be "interpreted strictly to create a demanding standard for qualifying as disabled . . . ." *Williams*, 534 U.S. at 195.  Importantly, simply having an impairment that does not substantially limit a major life activity is not a disability, and therefore is not covered by the ADA.  *Id.* at 197.  A court should consider the nature, severity, duration, and the permanent or long-term impact when deciding whether that impairment substantially limits a major life activity.  *See* 29 C.F.R. § 1630.2(j)(2)(i)-(iii).  Further, the impairment must be of an extended or permanent duration.  *Williams*, 534 U.S. at 198 (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).

In the Third Circuit, courts follow the EEOC's two-step analysis in determining whether an individual is substantially limited in one or more of the major life activities.  *Mondzelewski v. Pathmark Stores*, *Inc.*, 162 F.3d 778, 783-84 (3d Cir. 1998); 29 C.F.R. pt. 1630, app. § 1630.2(j).  First, the court determines whether the individual is substantially limited in any major life activity other than working.  *Mondzelewski*, 162 F.3d at 783-84.  "If the court finds that the individual is substantially limited in any of these major life activities, the inquiry ends there.  On the other hand, if the individual is not so limited, the court's next step is to determine whether the individual is substantially limited in the major life activity of working."  *Id*. at 784.

In this case, the record does not show that at the time of the alleged discrimination a

reasonable jury could find that Jacoby's impairment substantially limited a "major life activity." First, there is no evidence that Jacoby was restricted from doing any major life activity other than working. *See Mondzelewski,* 162 F.3d at 783-84. Jacoby asserts in his opposition that his knee impairment substantially limited his abilities to kneel, crawl and lift more than fifty pounds.[22] However, even if I were to assume that Jacoby's knee impairment permanently restricted his abilities to kneel, crawl and lift more then fifty pounds, these activities do not reach the qualitative level of those deemed as "major" by the EEOC, *see* § 1630.2(i), and they do not meet the demanding standards set by the Supreme Court in *Williams*, *see* 524 U.S. at 195. I am also guided by "the plain meaning of the word 'major[,' which] denotes comparative importance and suggests that the touchstone for determining an activity's inclusion under the statutory rubric is its significant." *Bragdon*, 524 U.S. at 638 (quotations omitted). Further, while the Third Circuit has not addressed whether kneeling and crawling are major life activities, multiple courts of appeals and district courts considering the issue under the ADA have determined that kneeling and crawling do not constitute major life activities.[23] I find this weight of authority persuasive,

---

[22]Jacoby does not claim or provide any evidence to support an allegation that his limitation substantially impacted any major life activity other than the ones identified in his opposition. For instance, at all relevant times, Jacoby lived alone and had no problems taking care of himself. (Pl.'s Dep. 28.) In fact, he opted to have two separate surgeries on his knees so that he could continue to take care of himself. (*Id.* at 96-97.)

[23]*See Gretillat v. Care Initiatives*, 481 F.3d 649, 654 (8th Cir. 2007) ("Crawling, kneeling, crouching and squatting cannot be qualitatively characterized as sufficiently significant or essential to be on par with the functions set forth in 29 C.F.R. § 1630.2(i) as exemplifying major life activities."); *Black v. Roadway Express*, 297 F.3d 445, 450 (6th Cir. 2002); *Kersey v. Reddick*, 32 F. App'x 351, 351 (9th Cir. 2002) (unpublished) (concluding plaintiff's limitations with respect to repetitive twisting, bending, kneeling or reaching do not substantially limit major life activities); *Hockaday v. Brownlee*, 370 F. Supp. 2d 416, 423 (E.D. Va. 2004) (concluding crawling, kneeling and squatting are not major life activities); *Ruggles v. Keebler Co.*, 224 F. Supp. 2d 1295, 1301 (D. Kan. 2002) (finding crawling on the floor with grandchildren is not

and in the absence of any applicable opposing authority cited by Jacoby,[24] I conclude that

kneeling and crawling do not qualify as major life activities for the purposes of the ADA.

Additionally, even though lifting is a major life activity, *see* 29 C.F.R. pt. 1630, app. §

1630.2(i), a lifting restriction of fifty pounds does not constitute a substantial limitation on the

ability to lift.  *Marinelli*, 216 F.3d at 364 (concluding that plaintiff's ten-pound limitation being

"not far removed from the twenty-five pound restrictions our sister circuits have held not to

render one disabled under the ADA" does not render him substantially limited in his ability to

lift; and noting that the Ninth Circuit held that a person who could only lift fifty pounds twice a

day and 100 pounds once a day was not so disabled); *Siegfried v. Lehigh Valley Dairies*, 2003

WL 23471747 (E.D. Pa. Oct. 29, 2003) (finding that plaintiff's ability to lift up to fifty pounds

---

major life activity); *Miller v. Airborne Exp.*, 1999 U.S. Dist. LEXIS 811, at *12 (N.D. Tex. Jan. 22, 1999) ("While [plaintiff's] knee injury may substantially limit his ability to crawl, kneel, squat or climb, this Courts finds that those actions do not constitute major life activities, as defined under the ADA."); *Piascyk v. City of New Haven*, 64 F. Supp. 2d 19, 26 (D. Conn. 1999) ("Running, jumping, climbing stairs and ladders, and crawling simply are not sufficiently significant or essential functions to qualify as major life activities under the ADA.").  *But see Mangus v. Metavante Corp.*, 2006 U.S. Dist. LEXIS 14414, at **57-58 (E.D. Wisc. Mar. 17, 2006) (stating, but not explaining, that plaintiff had generally identified major life activities "such as walking" in his assertion of limitations in the areas of "walking, standing, lifting, stooping (squatting) and kneeling").

[24]Jacoby cites *Sicoli v. Nabisco Biscuit Co.*, 1998 U.S. Dist. LEXIS 8429 (E.D. Pa. June 8, 1998), to support his argument that kneeling, crawling and lifting more than fifty pounds are major life activities.  However, while the *Sicoli* court concluded that its plaintiff had met his burden of raising a material issue of fact concerning whether he was significantly restricted in a major life activity other than working, this case did not specifically address the activities of kneeling, crawling and lifting more than fifty pounds.  Instead, it focused on performing manual tasks, taking care of oneself, reaching, standing and various lifting limitations of well under fifty pounds (23 to 33 pounds occasionally; 10, 12, 14 pounds occasionally and frequently at varying heights).  *Sicoli*, 1998 U.S. Dist. LEXIS 8429, at **10-14.  Indeed, with respect to Jacoby's lifting restriction of no more than fifty pounds, *Sicoli* supports Arkema's view that this activity is not "major" by stating "courts seem to agree lifting restrictions of 25 pounds or more are not significant."  1998 U.S. Dist. LEXIS 8429, at *12 (quotations omitted).

does not constitute a disability within the Third Circuit).  Thus, I find that Jacoby has failed to raise a substantial issue of material fact that his knee impairment substantially limits a major life activity other than working.

Second, Jacoby has neither alleged nor presented any evidence that his knee impairment constitutes a significant barrier to employment for him.  *See Mondzelewski*, 162 F.3d at 784.  In order to demonstrate substantial limitation in the major life activity of working, he need only to demonstrate that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *see also Sutton*, 527 U.S. at 491 (holding that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs"); *Mondzelewski*, 162 F.3d at 783.

However, in this case, Jacoby has not alleged that he is unable to work in a class of jobs or broad range of jobs, as required by the ADA.  He only lists the restrictions that his doctors placed on his work.  *See Marinelli*, 216 F.3d at 365 ("[The plaintiff cannot] avoid judgment as a matter of law simply by pointing to the restrictions that [his doctor] placed upon his work.").  In fact, the record provides ample evidence of Jacoby's transferable skills and experiences that would not substantially limited him from working.  *See Sutton*, 527 U.S. at 492 ("If jobs utilizing an individual's skill (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.")  He completed his sophomore year in high school and took classes at a community college.  (Pl.'s Dep. 16.)  He served four years of active duty in the Marine Corps, during which he achieved the rank of Corporal IV, and spent two years in the

20

reserves after his active duty.  (*Id.* at 18.)  At Arkema, he gained a significant amount of management and supervisory experience, including training employees, generating and reviewing reports, running drills, conducting audits, and obtaining and supervising third-party vendors.  (*Id.* at 64; Dopson Dep. at 31-34, 38.).  Significantly, Jacoby himself denies that he was in any way limited from working.  (Pl.'s Dep. 214-15.)  Jacoby therefore has failed to establish that he would have been substantially limited from a class of jobs or a broad range of jobs because of his knee impairment given his education, training and skill level.  Thus, he is not disabled under the ADA.

Moreover, Jacoby's claim must also fail because, while his doctor limited him to work without kneeling, crawling or lifting more than fifty pounds, "as a matter of law, a 'transient, nonpermanent condition,' *McDonald v. Pennsylvania*, 62 F.3d 92, 94-97 (3d Cir. 1995), or 'a temporary, non-chronic impairment of short duration,' *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002), . . . fall short of substantially limiting an individual in a major life activity." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 765 (3d Cir. 2004); *see also Williams*, 534 U.S. at 198 ("The impairment's impact must also be permanent or long-term.") (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).  Further, the EEOC has recommended that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities" and provided broken limbs and strained joints as examples. 29 C.F.R. pt. 1630, app. § 1630.2(j).  While the replacement of both knees is clearly more severe than a broken limb, there is no evidence that these surgeries rendered Jacoby permanently impaired.  In fact, Jacoby testified that his knees have recovered "95 percent" from his surgeries, and he is able to bend, squat, and lift heavy objects.  (Pl.'s Dep. 26-28, 167, 214-15.)  At the time of his deposition in January 2007, less than one year after his departure from Arkema in February

2006, Jacoby was installing a Pergo floor in his home, which required that he bend, kneel and squat.  (*Id*. at 27-29.)  He stated he had no problems carrying the boxes of materials weighing more than forty pounds each up a flight of stairs without assistance.  (*Id.*)  Even though it took some time for Jacoby to recover from his various surgeries, he has presented insufficient evidence for a reasonable jury to find that he was disabled under the ADA.

### 2.    Regarded as Having an Impairment

Jacoby also alleges in his complaint that he was "regarded as and/or perceived by Defendant and its agents as having a physical impairment that substantially limited/limits one or more major life activities."  (Compl. ¶ 41.)  There are two ways in which individuals may fall within the "regarded as" definition of disability:  "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Sutton*, 527 U.S. at 489.   In either case, the plaintiff must prove that the covered entity entertained certain misperceptions – "it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  *Id.* at 489.  A misperception need not be a result of stereotypes or prejudice, as "[e]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity . . . of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability."  *Deane*, 142 F.3d at 144; *see also Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 191 (3d Cir. 1999).  However, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled. . . ."

*Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996); *see also Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir. 2007) (finding some impairment not enough).

Here, there is no dispute that during the relevant time period, Jacoby was restricted by his doctors from kneeling, crawling or lifting fifty pounds.[25]  It is also undisputed that Arkema was aware of Jacoby's physical limitations.  Thus, Jacoby appears to argue that Arkema misperceived these limitations and regarded him substantially more limited than he actually was.  While Jacoby's complaint itself does not identify any major life activities which Arkema mistakenly regarded him as being substantially limited from doing (*see* Compl. ¶ 41), in his opposition to Arkema's motion, Jacoby contends that Arkema "refused to permit him to work, based on an erroneous perception that he was unable to perform a number of his job requirements."  (Pl.'s Opp'n 8.)  Thus, I assume that Jacoby's "regarded as" claim is that Arkema erroneously perceived Jacoby to be substantially limited in the major life activity of working.  In its motion for summary judgment, Arkema argues that while it was aware of the work restrictions imposed by Jacoby's doctors, Jacoby cannot establish a genuine issue of material fact that it made any mistake about the severity of his impairments.

To support his contention that his employer regarded him as disabled, Jacoby claims that his supervisor, Dopson, mistakenly believed that with the kneeling, walking, and lifting restrictions in place, Jacoby would be limited in his duties as a first responder and as an assessor at the scene of a chemical spill.  (*See* Dopson's Dep. 101-04.)  In his opposition, Jacoby states that when asked what Jacoby was unable to do with the restrictions in place, Dopson testified:

---

[25]Jacoby himself presented these doctor-imposed restrictions to Arkema.  He also testified that no one at Arkema made the decision that he was unable to crawl and kneel.  (Pl.'s Dep. 91.)

> [T]he fact that he needed to be able to get around as a first responder
> and fulfilling those duties and capabilities, the fact that he would be
> required to go up and down multiple flights of stairs many times
> during the shift where he would be working, the fact that supervisors
> spend very little time in the office, most of their work is involved out
> and about through many areas of the plant, at many different levels.

(Pl.'s Opp'n 7 (citing Dopson Dep. 95-96).)  Jacoby also asserts that Dopson based the decision

not to allow him to return to work on observations Dopson had made approximately one year

earlier, when Jacoby did have some difficulties in his mobility.  (Pl.'s Opp'n 7-8.)

However, this testimony, which is the only evidence marshaled by Jacoby in his support

of his "regarded as" claim, does not show that Arkema somehow considered his impairment

more serious than it actually was.  Dopson's understanding of the restrictions that were placed on

Jacoby's work were the same ones specifically identified in the medical records provided by

Jacoby from Dr. Schoifet and by Healthworks.  Thus, assuming that Jacoby has offered, through

Dopson's quoted testimony, an accurate reflection of Arkema's perception of Jacoby's knee

impairment, at best it shows Arkema believed that Jacoby was unable to perform what it

considered to be essential functions of the PM Supervisor position due to his doctor's

restrictions.  But Dopson's testimony does not establish Arkema mistakenly perceived Jacoby

unable to fulfill any other position at its Bristol Plant or that Jacoby was unable to work in

general.  Further, Jacoby has not offered any evidence to suggest that the return-to-work

evaluation, performed by Bretz and approved by Yacoe, *see supra* note 18, incorrectly

determined that Jacoby was unable to perform the requirements of any job at the Bristol Plant.[26]

---

[26]In this regard, Jacoby miscasts Dopson as the sole decision maker who determined
Jacoby could not perform the essential functions of his job.  In fact, Bretz first determined that
Jacoby's limitations prohibited him from performing the PM Supervisor job, and only then did
he seek Dopson's concurrence.  (Bretz Aff. ¶ 16; Dopson Dep. 110.)  Ultimately, Yacoe, the

Most courts have found that "an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job." *Branham v. Snow*, 392 F.3d 896, 904 (7th Cir 2004) (finding no evidence that the employer believed that plaintiff's impairment substantially limited him in one or more major life activities); *see also Dunaway v. Ford Motor Co.*, 134 F. App'x. 872, 878 (6th Cir. 2005) (finding that the imposition of limiting restrictions on standing, climbing, squatting, kneeling or lifting for the purpose of employment in one position with employer is not tantamount to a perception by employer that plaintiff was unable to perform these restricted activities in his daily life); *Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir. 1986).

There is also no evidence that Arkema believed Jacoby's condition had any residual or long term impact.  *See Williams*, 380 F.3d at 765 (stating temporary, non-chronic impairments with little or no long-term impact do not qualify as disabilities under the ADA); 29 C.F.R. § 1630.2(j)(3)(i).  It is undisputed that following each of Jacoby's knee surgeries, he was temporarily impaired and had limited mobility.  (Pl.'s Dep. 31, 95-96, 115, 161, 170-71; Dopson Dep. 23.)  While Jacoby asserts that Arkema effectively replaced him with Kirschner, he has not presented any evidence from which a reasonable juror could conclude that Arkema considered Kirschner's assumption of Jacoby's responsibilities while Jacoby was out on leave in 2004 to be permanent.  Rather, the record reflects that Arkema perceived Jacoby's impairments to be temporary, otherwise it would not have maintained Jacoby's position as a PM Supervisor during

---

Bristol plant manager, approved Bretz's and Dopson's recommendation that Jacoby was ineligible to return to work as a PM Supervisor.  (*Id*. ¶ 22.)  Jacoby does not offer any evidence to refute the return-to-work evaluation as it was performed in his case.

the nearly three years that Jacoby was on leave.[27]  In fact, according to Dopson, Jacoby's

supervisor, Arkema anticipated Jacoby would fully recover and return to his position once

cleared by his doctors to do so.  (Dopson Dep. 109-10.)  Jacoby neither offers evidence nor

points to any inferences from the record to suggest that Arkema's view of Jacoby's recovery was

anything other than as it was testified to by Dopson.

Further, even though Jacoby now contends that his knee is nearly one hundred percent

healed, prior to his February 2006 retirement from Arkema, he never informed his employer that

he no longer had any physical restrictions on kneeling, crawling and lifting.  (Pl.'s Dep. 92, 167.)

In fact, from his April 2005 meeting with Dopson to his February 2006 departure from the

company, Jacoby did not offer Arkema any further documentation regarding his medical

condition.  (*Id*. at 202.)  Thus, other than what Arkema already had available from Jacoby's

doctors with regard to his physical limitations, it is not clear what other impairments Arkema

mistakenly thought Jacoby had.  Even if Arkema mistakenly believed that Jacoby was still

limited in his kneeling, crawling and lifting in February 2006, the fact that Jacoby failed to

correct this impression does not work in his favor.

In summary, both sides agree that the only restrictions on plaintiff were that he could not

kneel, crawl or lift fifty pounds as of April 15, 2005.  Further, the record at most demonstrates

that Arkema regarded Jacoby's knee impairment as limiting only his ability to work as a PM

---

[27]Jacoby requested and received:  1) a 6-month leave in 2001; 2) a 4-month leave in May 2003; 3) a 4-month extension of his leave in September 2003; 4) a 6-month leave in May 2004; and 5) a 5-month extension of his leave in November 2004.  Jacoby admits that Kirschner filled in for him during his 2004 leave and was permanently assigned to that position only after he retired.  Kirschner was already a PM Supervisor who worked on other shifts or was assigned to other roles before Jacoby took his leaves of absence.  (See Pl.'s Resp. to Def.'s Statement of Allegedly Undisputed Facts Nos. 94, 95.)

Supervisor, but not his ability to work in general.  There is no evidence Arkema mistakenly

believed Jacoby's condition was permanent or had any long-term impact.  Thus, I conclude that

Jacoby fails to provide sufficient evidence from which a reasonable juror could conclude that his

employer "regarded him" as disabled within the meaning of the ADA.  Accordingly, I will grant

Arkema's motion for summary judgment on Jacoby's ADA claim because he failed to meet the

first step of his *prima face* case, i.e., establishing that he is "disabled."[28]   As such, Jacoby's

PHRA claim must also fail.  *See Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002).


**B.     Age Discrimination Claims (Counts II and VI)**

Jacoby alleges that Arkema "repeatedly encouraged [him] to retire rather than return to

work" and that he was "terminated and replaced with a younger employee."  (Compl. ¶ 38.)   The

ADEA provides in relevant part that "it shall be unlawful for an employer to . . . discharge any

individual . . . because of such individual's age."  29 U.S.C. § 623.  In order to establish a prima

facie case of discrimination, the plaintiff must demonstrate that: "(1) s/he is over forty, (2) is

qualified for the position in question, (3) suffered from an adverse employment decision, and (4)

that his or her replacement was sufficiently younger to permit a reasonable inference of age

discrimination."  *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (citing

*Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).  These requirements are

"not intended to be onerous."  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995).

---

[28]Because I find Arkema is entitled to judgment because of Jacoby's failure to meet his
burden at the first step of his *prima facie* ADA claim, I do not reach the issue of whether or not
Jacoby is a "qualified individual with a disability" within the meaning of the ADA or whether
Arkema failed to accommodate Jacoby's disability.

In cases brought under the ADEA, the age of the plaintiff must have played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000).

In its motion for summary judgment, Arkema contends that Jacoby has failed to meet his burden of establishing a *prima facie* case of age discrimination. There is no dispute that Jacoby was over forty, but Arkema denies that Jacoby suffered an adverse employment decision. As discussed below, because I conclude that Jacoby has failed to present sufficient evidence from which a reasonable juror could find that he suffered an adverse employment decision, summary judgment on his ADEA and PHRA claims will be granted.[29]

A tangible, adverse employment action must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Such an action "in most cases inflicts direct economic harm and requires an official act taken by a supervisor within the company who has the power to make economic decisions affecting employees under his or her control." *Id.* at 762. The action must be an actual adverse action, "as opposed to conduct that the employee generally finds objectionable." *Harley v. McCoach*, 928 F. Supp. 533, 541 (E.D. Pa. 1996) (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 387-88 (3d Cir. 1995)).

In this case, Jacoby testified that his employment was not terminated (*see* Pl.'s Dep. 36), thus his ADEA and PHRA claims cannot survive on this basis. Nor has Jacoby alleged or

---

[29]Additionally, as described below, the lack of an adverse employment action provides another ground upon which summary judgment will be granted in Arkema's favor on Jacoby's ADA and PHRA claims.

provided any evidence that he was demoted, reassigned, or received a significant change in benefits.[30]  His allegation that he was forced to retire might be construed as a constructive discharge claim.  *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993) (citing forced retirement as an example indicative of constructive discharge).  However, even if Jacoby had pleaded that he was constructively discharged, a reasonable person could not find that he has presented evidence of such a claim.

For a constructive discharge claim under the ADEA and the PHRA to survive summary judgment, a plaintiff must establish that his employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984); *see also Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006).  In other words, the plaintiff must show that the alleged discrimination goes far beyond a "threshold of intolerable conditions." *Duffy*, 265 F.3d at 169 (internal quotation marks omitted).  In the context of Jacoby's claim of forced retirement, "the issue of voluntariness is the factor distinguishing discharge from a mere early retirement."  *Embrico v. U.S. Steel Corp.*, 2007 U.S. App. LEXIS 19663, at *8 (3d Cir. Aug. 16, 2007) (unpublished) (citing *Baker v. Consol. Rail Corp.*, 835 F. Supp. 846, 852 (W.D. Pa. 1993)); *see also Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir. 1987).  The voluntariness of Jacoby's retirement turns on whether his decision to retire was "'informed, free from fraud or misconduct, and made after due deliberation.'"  *Embrico*, 2007 U.S. App. LEXIS

---

[30]In his complaint, Jacoby alleges that his shift differential pay was eliminated, "while that of younger workers on leaves of absence were not."  (Compl. ¶ 38.)  However, Jacoby does not provide any evidence to support this allegation; therefore, I find that his ADEA and PHRA claims cannot rest on this bald assertion.

19663, at *8 (quoting *Baker*, 835 F. Supp. at 852); *see also Gray v. York Newspapers Co.*, 957 F.2d 1070, 1081 (3d Cir. 1992).

Viewing the record in a light most favorable to Jacoby, there is no genuine issue of material fact to support Jacoby's claim that his retirement was not voluntary. Jacoby testified that no Arkema employee ever told him that he was too old to do his job. He never heard anyone make any derogatory comments about his age. (Pl.'s Dep. 135-36.) During Jacoby's February 2004 meeting with Griffith, she was polite, professional, and respectful, and did not make any statements regarding his age. (*Id.* at 135-36.) The only person to ever discuss retirement with him was McGee, a non-supervisory administrative assistant, who only had two conversations about retirement with Jacoby in mid-April 2005. (McGee Dep. 45; Pl.'s Dep. 45.) At no point during these conversations did McGee insist that retirement was mandatory, and when Jacoby contacted Human Resources upon receiving the retirement papers that McGee had requested be drafted as an option for him to consider, a representative of that department confirmed that retirement was not necessary. (McGee Dep. 42, 43; Pl.'s Dep. 203.) Jacoby has produced no evidence that suggests a supervisor, any employee other McGee, or even McGee herself, repeatedly urged that he retire. He, in fact, testified that his relationship with McGee was "good," that she was a "very nice person" and "nice" to him, and that they mostly had "general conversation." (Pl.'s Dep. 202.) A reasonable person could not find two relatively cordial conversations in the context of a good working relationship and a follow-up phone call with Human Resources intolerable, or a retirement decision following this level of activity involuntary.

Additionally, Jacoby testified that his retirement was involuntary because he feels that it

would have taken longer than three days for the papers to arrive at his house after the retirement discussion with McGee and that McGee would not have ordered the papers on her own because she is a "secretary." (Pl.'s Dep. 143-45, 151-52.). However, a reasonable person could not find the receipt of retirement papers following a conversation in which Jacoby himself told McGee to send them, even though he might not consider them, so intolerable as to compel Jacoby to retire. (*See id.* at 40)  Moreover, Jacoby does not present any other evidence that suggests someone other than McGee ordered the papers sent to him.  McGee testified that she never heard anyone say that Jacoby should retire.  (McGee Dep. 35.)  She further testified that she raised the option of retirement on her own based solely on the number of years of his service to Arkema (*id.* at 35, 40; Pl.'s Dep. 40), and that no management-level employee had suggested to her that she ought to discuss retirement with Jacoby (McGee Dep. 35).  Thus, Jacoby has not demonstrated that the conditions of his employment were such that a reasonable person would have been compelled to retire, or that his decision to retire was anything but "informed, free from fraud or misconduct, and made after due deliberation." *Embrico*, 2007 U.S. App. LEXIS 19663, at *8 (quotation omitted).  As Jacoby has presented insufficient evidence to show that he suffered an adverse employment action, Arkema's motion for summary judgment on his ADEA and PHRA claims will be granted.[31]

### C.      Retaliation Claims (Counts II, IV, and V)

Jacoby alleges Arkema unlawfully retaliated against his opposition to Arkema's disability and age discrimination. (Compl. ¶¶ 47, 55.)  Further, Jacoby alleges Arkema violated his rights

---

[31]As such, I do not reach Arkema's argument that Jacoby has not alleged and has failed to put forth sufficient evidence from which a reasonable juror could conclude that age was the determining factor in the alleged discriminatory decision.

under the FMLA by retaliating against his taking FMLA leave.  (*Id.* ¶ 58.)  To establish a *prima facie* case of retaliation under the ADA[32] or the ADEA,[33] a plaintiff must show:  (1) that he engaged in protected employee activity; (2) that he suffered adverse employment action by the employer either after or contemporaneous with the employee's protected activity; and (3) that there is a causal connection between the employee's protected activity and the employer's adverse action.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).[34]  Additionally, to advance an FMLA retaliation claim,[35] it is the plaintiff's burden to show:  (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to that leave.  *Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 463 (E.D. Pa. 2005) (citing *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004)).

Jacoby, however, has not met his burden of establishing a *prima facie* case of retaliation

---

[32]The ADA anti-retaliation provision states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).

[33]The ADEA anti-retaliation provision provides,  "It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).

[34]Because the retaliation prohibitions contained in the ADA and ADEA are nearly identical, the Third Circuit has held that precedent interpreting any one of these statutes is relevant to interpretation of the others.  *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567 (3d Cir. 2002).

[35]A retaliation theory claim "arises under 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave."  *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004) (citation omitted).

under any of the three statutes.[36]  For the reasons discussed above, Jacoby has failed to present

sufficient evidence from which a reasonable juror could conclude that he suffered an adverse

employment action, a necessary element of his three retaliation claims.  Further, with regard to

his ADA and ADEA claims, Jacoby did not engage in any protected activity until July 20, 2005,

when he filed a Charge of Discrimination with the EEOC.  He did not make any internal

complaints of discrimination while employed by Arkema.  (Pl.'s Dep. 210.)  He has not alleged

nor has he provided any evidence that Arkema took any action with regard to his employment

after July 20, 2005, thus he is also unable to make out a causal connection between his protected

activity under the ADA and ADEA and *any* kind of action on the part of Arkema.  Accordingly,

Arkema's motion for summary judgment will be granted as to Jacoby's ADA, ADEA, and

FMLA retaliation claims.

## IV.    Conclusion

For the aforementioned reasons, I will grant Arkema's motion for summary judgment.

An appropriate order follows.

---

[36]Jacoby has not pursued a retaliation claim under the PHRA.

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD JACOBY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 06-2339 |
| v. | : | |
| | : | |
| ARKEMA, INC. | : | |
| d/b/a ATOGLAS | : | |
| d/b/a ATOFINA CHEMICALS, | : | |
| Defendants. | | |

YOHN, J.

# Order

AND NOW, this _____ day of October, 2007, upon consideration of defendant Arkema Inc.'s motion for summary judgment (Doc. No. 6), as well as plaintiff Leonard Jacoby's response and defendant's sur memorandum, it is hereby **ORDERED** that defendant Arkema Inc.'s  motion for summary judgement is granted.  Judgment is **ENTERED** in favor of defendant Arkema, Inc., d/b/a Atoglas, d/b/a Atofina Chemicals and against plaintiff Leonard Jacoby.

s/William H. Yohn Jr.

William H. Yohn Jr., Judge